UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GARY DeFILIPPO,

                            Plaintiff,

            - against -                                              MEMORANDUM & ORDER
                                                                      00-CV-2109 (NGG)(JMA)

THE NEW YORK STATE UNIFIED COURT
SYSTEM, OFFICE OF COURT ADMINISTRATION,
DEPUTY CHIEF ADMINISTRATIVE JUDGE JOAN          NOT FOR PUBLICATION
B. CAREY, MAJOR PATRICK RUSSO, SGT. ERIN
CORCORAN and SGT. ROBERT SINGER,

                            Defendants.
------------------------------------------------------------X

GARAUFIS, District Judge.

        Before the court are cross-motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56 brought by the Plaintiff in this action, Gary DeFilippo ("Plaintiff"), and by the

Defendants (collectively "Defendants"), the Honorable Joan B. Carey, Deputy Chief

Administrative Judge of the New York City Courts ("Carey"), Patrick Russo ("Russo"), Erin

Corcoran ("Corcoran"), and Robert Singer ("Singer").  The Plaintiff, who is pro se but a licensed

and practicing attorney, has brought suit against the Defendants pursuant to 42 U.S.C. § 1983

alleging violations of his rights under the First and Fourteenth Amendments, specifically that the

Defendants retaliated against him for speaking out against fellow employees of the New York

State Unified Court System.

        For the reasons set forth below, the Plaintiff's motion for summary judgment is denied in

its entirety, and the Defendants' motion for summary judgment is granted in full.

## I.    Factual Background

### A.    The Parties Briefings on the Cross-Motions for Summary Judgment

Before turning to the material facts underlying this action and the pending motions, I find it helpful to outline the motion papers filed in support of and in opposition to the motions as the submissions have been voluminous, and in some instances, contested.

On June 3, 2005, the Plaintiff and the Defendants cross-moved for summary judgment. In support of their motion, the Defendants submitted via ECF a statement pursuant to EDNY Local Rule 56.1 (Defs.' Rule 56.1 Stmt.),[1] declarations of each defendant, an affirmation of defense counsel, Constantine A. Speres, with accompanying exhibits A through XX ("Defs.' Exs."), and Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defs.' Mem."). (See Docket Entry Nos. 104, 105, 106, 107).

The Plaintiff, on that same date, submitted via ECF a Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem.") and an Affirmation in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Aff."), accompanied in hard copy by Plaintiff's Exhibits A through G. (See Docket Entry No. 103, 108). Notably, the Plaintiff did not submit a Statement Pursuant to Rule 56.1 to support his motion for summary judgment as is required by Local Civil Rule 56.1.[2]

---

[1] The Defendants' Rule 56.1 Statement was filed under seal. (See Docket Entry No. 107; Minute Entry for status conference before Honorable Nicholas G. Garaufis held on 7/6/06).

[2] Rule 56.1(a) of the Local Rules of the EDNY provides as follows:

Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit

On July 22, 2005, the parties submitted responses to the cross-motions. The Plaintiff filed via ECF a Memorandum of Law in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Resp."), a Declaration of Plaintiff submitted both in support of Plaintiff's motion and in opposition to Defendants' motion ("Pl.'s Decl."), and in hard copy supplemental exhibits 1-8.[3] (See Docket Entry Nos. 120, 121, 122, 125). The Defendants submitted a Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Summary Judgment and in Further Support of their Motion for Summary Judgment ("Defs.' Resp."), and several supplementary exhibits. (See Docket Entry Nos. 123, 124). In their responsive Memorandum of Law, the Defendants drew the court's (and the Plaintiff's) attention to the fact that Plaintiff had failed to file a Rule 56.1 Statement with his motion for summary judgment in violation of the local rule. Defendants argued that the Plaintiff's motion was procedurally defective and therefore should be summarily denied. (See Defs.' Resp. at 2-3).

On July 27, 2005, the Plaintiff ECF filed an 89-paragraph Statement Pursuant to Rule 56.1 ("Pl.'s 56.1 Stmt."). (See Docket Entry No. 127). The document is dated June 3, 2005. (Id.). In a series of letters to the court which followed, the Plaintiff and Defendants' counsel debated whether the Plaintiff had merely inadvertently failed to ECF file his Rule 56.1 Statement on June 3, 2005, as Plaintiff claims, or whether he had created the document in July after the Defendants served their response to Plaintiff's motion, as Defendants maintain. (See Docket

---

such a statement may constitute grounds for denial of the motion.

[3] The hard copy of Plaintiff's supplemental exhibits 1-8 was filed with the Clerk of the Court on July 27, 2005. The Plaintiff filed via ECF on July 25, 2005 a letter to the court explaining that he was having trouble ECF filing his supplemental exhibits and requesting permission to file them in hard copy. (See Docket Entry No. 126).

Entry Nos. 130, 131, 132, 133). By Order dated August 3, 2005, this court denied Defendants'

motion to strike the Plaintiff's Rule 56.1 Statement.

On August 12, 2005, the parties submitted their final replies to the cross-motions. The

Plaintiff submitted additional exhibits numbered 9-14, and a Memorandum of Law in Reply and

in Further Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Reply"). (See Docket

Entry Nos. 137, 138, 143). Defendants submitted a further affirmation from defense counsel,

which again challenged the Plaintiff's Rule 56.1 Statement, Defendants' Reply Memorandum of

Law in Further Support of their Motion for Summary Judgment ("Defs.' Reply), and Defendants'

Counter-Statement Pursuant to Local Rule 56.1(b) ("Defs.' 56.1 Ctr-Stmt."). (See Docket Entry

Nos. 139, 140, 141). The above-mentioned papers represent the universe of argument and

evidence considered on these cross-motions.

I will now briefly address the issue of Plaintiff's Rule 56.1 Statement and his alleged

failure to comply with the EDNY local rules governing summary judgment motions. I note at the

outset that Plaintiff is a pro se litigant in that he is not represented by independent counsel. In

general, a pro se litigant is entitled to a certain amount of latitude in his pleadings and motion

practice. Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) ("It is well settled that pro se

litigants generally are entitled to a liberal construction of their pleadings, which should be read

'to raise the strongest arguments that they suggest.'") (citing Graham v. Henderson, 89 F.3d 75,

79 (2d Cir.1996)). That a plaintiff is pro se, however, "does not allow him to rely on conclusory

allegations or unsubstantiated speculation to overcome a motion for summary judgment."

Almonte v. Florio, No. 02 Civ. 6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004).

Moreover, in the present case, the Plaintiff is not a traditional pro se litigant because he is a practicing attorney himself. All of the Plaintiff's correspondence with opposing counsel and the court is on stationary which reads "Law Offices of Gary R. DeFilippo, Esq." at the top. As a licensed attorney, the Plaintiff is not entitled to the latitude typically afforded to a pro se litigant. See Levine v. McCabe, 357 F.Supp.2d 608, 613 -614 (E.D.N.Y. 2005) ("practicing attorneys who choose to represent themselves cannot claim the special considerations normally afforded to pro se litigants") (citing Harbulak v. Suffolk Cty, 654 F.2d 194, 198 (2d Cir.1981)); see also Robert v. Dep't of Justice, No. 99-CV-3649, 2001 WL 34077473, at *1 (E.D.N.Y. Mar. 22, 2001) ("plaintiff is an attorney licensed to practice law and therefore is not entitled to special treatment").

The Defendants claim that the Plaintiff violated Local Rule 56.1(a) by his failure to submit a Rule 56.1 Statement of Material Facts at the time his motion was noticed. I have already denied the Defendants' motion to strike Plaintiff's untimely filed Rule 56.1 Statement, and I adhere to that ruling today. I will assume that Plaintiff inadvertently failed to timely file the document and credit his explanation as to the conflicting dates of submission, and I will consider Plaintiff's Rule 56.1 Statement in deciding the Plaintiff's cross-motion.

Although I find that Plaintiff has not violated subsection (a) of Rule 56.1, he has nonetheless failed to comply with other subsections of the Rule, which state:

> (b) The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.
>
> *      *      *

(d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

In response to the Defendants' Rule 56.1 Statement, the Plaintiff failed to submit a Counter-Statement of Material Facts, which violates Rule 56.1(b) and permits the court to deem the facts submitted by the moving party in its 56.1 Statement as "admitted for the purposes of the [Defendants'] motion" because they have not been "specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). Of course, in light of the fact that there are cross-motions for summary judgment before the court, the absence of a counter-statement of material facts by one party is significantly less problematic in terms of culling the facts that the parties deem material and not in dispute.

Additionally, in Plaintiff's Rule 56.1 Statement in support of his cross-motion for summary judgment, many of the numbered paragraphs are not followed by citations to admissible evidence as is required by Local Rule 56.1(d); these proffered facts will not be considered. See Gallimore-Wright v. Long Island R.R. Co., 354 F. Supp. 2d 478, 483 (S.D.N.Y. 2005). To the extent that the Plaintiff has put forward statements of material fact supported by citation to admissible evidence in the record, I will consider whether there are triable issues arising from those facts in accordance with the summary judgment standard. To the extent that the Plaintiff has failed to controvert material facts put forward by the Defendants in compliance with the local rule, those facts – but not the conclusions defendants draw therefrom – will be deemed admitted for purposes of the Defendants' motion. Onanuga v. Pfizer, Inc., 369 F. Supp.

2d 491, 493 n.1 (S.D.N.Y. 2005) (citing <u>Holtz v. Rockefeller & Co.</u>, Inc., 258 F.3d 62, 72 (2d Cir. 2001)).

I also note for the record, and will reference <u>infra</u>, that the Plaintiff has inappropriately presented argument in his statement of facts. Furthermore, in his memoranda of law submitted both in support of his motion and in opposition to the Defendants' motion, the Plaintiff has raised facts that he did not offer in his Rule 56.1 Statement or his affirmations. Many, if not all, of these facts are also unsupported in the record, and in any event, not properly presented to the court for consideration on a motion for summary judgment.

### B.    Plaintiff's Employment History

The following relevant facts have been offered for the court's consideration, many of which are in dispute. The Plaintiff is a former employee of the New York State Unified Court System ("UCS"), who was hired by UCS in 1990 and employed as a Senior Court Officer ("SCO") in Supreme Court, Kings County beginning in 1994. (<u>See</u> Pl.'s Decl. ¶¶ 2, 3). Defendant Carey serves as the Deputy Chief Administrative Judge of the New York City Courts for UCS. (Carey Decl. ¶ 2). In that role, she is responsible for supervising the day-to-day operations of all New York City courts. Her duties include assigning judges and other support personnel to courts, overseeing disciplinary actions brought against UCS employees, and implementing the rules, regulations and procedures of the Chief Judge of the State of New York and the Chief Administrative Judge of the New York State Courts. (<u>Id.</u> ¶ 4). The other defendants are employees and former employees of UCS, all of whom were employed at the time the alleged cause of action arose: Russo served as a SCO Major in Supreme Court Kings County;

Corcoran and Singer both served as SCO Sergeants in Supreme Court Kings County. (See Russo Decl. ¶ 2; Corcoran Decl. ¶ 2; Singer Decl. ¶ 2).

The Plaintiff was promoted from Uniform Court Officer to Senior Court Officer in November 1994, at which time he was transferred to Supreme Court Kings County, where the defendants worked. (Defs.' Ex. C). In approximately February 1995, the Plaintiff was assigned a "special security post" within the offices of the Supreme Court Kings County Court Reporters. (Pl.'s Decl. ¶ 5). The Plaintiff declares that he was assigned to this position because of "the large number of break-ins, thefts and other security problems at that location" which he states were believed to have been perpetrated by employees or other persons with knowledge of the courthouse's security procedures. (See Pl.'s Decl. ¶¶ 5-7). The Plaintiff offers no admissible evidence, beyond his statement, to support the fact that he was assigned to this special position or the fact that there was a security problem at the courthouse at this time.

On November 3, 1995, or a date close to it, the Plaintiff was counseled by Russo concerning an incident which had occurred on the morning of November 1, 1995 during which the Plaintiff was involved in a verbal and physical altercation with another SCO by the name of Edward Zottarelli. (Defs. Ex. D; Russo Decl. ¶ 6). The Plaintiff attests that Zottarelli approached him in a "hostile and threatening manner" at the behest of SCO Richard Glock, who "precipated the confrontation as part of some 'sick' prank to cause a confrontation between Plaintiff and Zotarelli." (Pl.'s Decl. ¶¶ 9-10). In an Evaluative Statement of Work Performance and/or Conduct prepared by Russo in connection with the counseling, the Plaintiff was warned that "should this type of behavior continue on your part, I will not hesitate to have strict

disciplinary action taken by either transferring you to another command or referring you to the Deputy Chief Judge for the City of New York for stipulations." (Defs.' Ex. D).

Approximately one month later, on December 11, 2005,[4] the Plaintiff was involved in a situation at the courthouse at 360 Adams Street, Brooklyn, concerning a stalled elevator. On that morning, the Plaintiff was operating a manual elevator when it stalled approximately two to four feet off the second floor lobby. (Corcoran Decl. ¶ 5; Pl.'s Decl. ¶ 22). Corcoran attests that when she arrived at the scene she instructed the Plaintiff to assist the passengers off the elevator. She declares that Plaintiff refused to comply with her order and shouted out loud at Corcoran "don't give me fucking orders." (Id. ¶¶ 6, 7). Corcoran submitted a Supervisors Complaint Report to Russo after the incident occurred, which stated that Plaintiff failed to comply with a directive given by Corcoran and yelled profanities at her in public. (Defs.' Ex. E; see also Pl.'s Decl. ¶ 22).

Nowhere in the Plaintiff's Rule 56.1 Statement, his Declaration or his Affirmation does the Plaintiff draw the court's attention to admissible evidence that disputes the facts offered by Corcoran regarding the elevator incident. In his Amended Complaint, the Plaintiff alleges that when the elevator malfunctioned he radioed a Sergeant Dave Costanzo to seek guidance in how to proceed, consistent with his elevator operating training and elevator emergency procedure training. (Am. Compl. ¶ 15). The Plaintiff claims Costanzo advised him to remain in the elevator, and that when Corcoran approached he explained to her that her directions contradicted Costanzo's and his own knowledge from emergency training. (See id. ¶¶ 18-21). This version

---

[4] Corcoran attests that the incident occurred on December 11, 1995; the Plaintiff attests that it took place on December 12, 1995. (See Corcoran Decl. ¶ 5; Pl.'s Decl. ¶ 22).

of events, however, is not in the record in admissible form, and therefore will not be considered on the Plaintiff's motion for summary judgment or in opposition to Defendants' motion for summary judgment. And, even if I were to determine that a triable issue of fact exists as to what occurred with regard to this elevator incident, the facts are nonetheless immaterial to the finding of whether Plaintiff or Defendants are entitled to judgment as a matter of law in this case.

Upon Russo's request, an investigation into Corcoran's allegations was undertaken by SCO Lieutenant W. Berwick, who interviewed six witnesses to the incident. (Russo Decl. ¶ 12). In a memorandum dated December 12, 2005 written by Berwick to Russo, the following investigative results were presented: SCO Sergeant Ray Butler heard the Plaintiff say to Corcoran "Don't give me any (fucking) orders" in a loud voice; SCO Sergeant Dave Costanzo did not hear any words spoken between the parties; SCO Karen Boyd-Gillen reported that both parties were speaking loudly and the Plaintiff said "Don't give me any (fucking) orders"; SCO Pat DeVito heard no argument; and two court reporters who had been on the elevator stated that the Plaintiff acted in a "courteous and professional manner" while on the elevator and that they did not know of an incident between Plaintiff and Corcoran. (See Defs.' Ex. F). On December 12, 2005, Russo gave the Plaintiff a verbal reprimand for disobeying Corcoran's order the previous day. (Russo Decl. ¶ 14).

A second incident between the Plaintiff and Corcoran occurred on January 31, 1996. On that date, Corcoran asked the Plaintiff to answer a ringing telephone located at the main desk in the courthouse lobby at 360 Adams. (Corcoran Decl. ¶ 9). According to Corcoran, the Plaintiff refused to answer the phone, indicating that the main desk was not his post and that the phone was not his responsibility. (Id.). Corcoran directed the Plaintiff to return to his post, at which

point the Plaintiff stated "I'm warning you not to give me orders." (Id.). Again, Corcoran submitted a Supervisor's Complaint Report to Russo detailing the incident. (Defs.' Ex. G). Russo directed SCO Captain Sanford Finkelstein to investigate; Finkelstein interviewed Corcoran and two other SCOs who witnessed the incident. (Russo Decl. ¶ 16; Defs.' Ex. H). Finkelstein reported by handwritten note to Russo that SCO Sergeant Mahoney stated that Corcoran's voice when she spoke with the Plaintiff was "normal," and that SCO Sergeant Divila stated that her voice was "somewhat raised." (Defs.' Ex. H). Mahoney also prepared a handwritten report for Finkelstein, which stated that he overheard a conversation between Corcoran and Plaintiff "in which Sgt. Corcoran asked SCO DeFilippo to answer a ringing phone, to which Off. DeFilippo replied in essence that it wasn't his post." (Id.).

Once again, the Plaintiff does not offer factual assertions with citation to admissible evidence that challenge the version of events offered by the Defendants with regard to the ringing phone incident.

On February 8, 1996, Russo notified Chief Clerk Gabriel J. Plumer in writing of the incidents that had occurred between Corcoran and the Plaintiff. Russo attached to his memorandum the reports filed concerning the previous incidents. (Russo Decl. ¶ 17; Defs.' Ex. I). In the memorandum, Russo explained that the Plaintiff requested that his matter be forwarded to the Office of the Inspector General for further investigation. (Defs.' Ex. I). Russo advised Plumer that he did not think investigation by the Inspector General's office was warranted as he found that the Plaintiff was "insubordinate to Sgt. Corcoran on two separate occations [sic]." (Id.).

Another incident took place on February 29, 1996. Again, the parties' recollections of the event differ. According to Corcoran, at approximately 8:30 a.m., she noted that the Plaintiff was not at his assigned post. (Corcoran Decl. ¶ 10). About twenty minutes later, she saw the Plaintiff in the lobby of the courthouse and asked him if he was assigned to the Johnson Street Entrance, to which the Plaintiff responded in the negative. (Id. ¶ 11). Corcoran asked who was assigned to that entrance, and attests that Plaintiff responded, "don't ask" and walked away. (Id. ¶ 12). Corcoran attempted to contact the Plaintiff via portable radio, but did not receive a response. (Id. ¶ 13).

The Plaintiff explains that at approximately 8:52 a.m. on the date in question, Corcoran entered the courthouse and accused the Plaintiff of not being at his assigned position earlier at the Johnson Street security post. (Pl.'s Decl. ¶ 32). According to the Plaintiff, Corcoran yelled across the lobby to the Plaintiff questioning about why he was not at the Johnson Street post. (Id.). The Plaintiff responded, "ask Lieutenant Hurley, he gives me my assignments." (Id.). The Plaintiff then continued on his way to his next assignment post in the County Clerk's Office. (Id.).

Corcoran's version of the incident was detailed in a third Supervisor's Complaint Report filed by SCO Sergeant Raymond Butler dated February 29, 1996. (See Defs.' Ex. J). The incident was investigated by Captain Finkelstein, who spoke with Sergeant Mahoney and SCO Raymond Wolff about the occurrence. (Russo Decl. ¶¶ 23, 24). Finkelstein reported the following to Russo, by memorandum dated March 1, 1996, accompanied by written statements by Mahoney and Wolff:

[Sgt. Mahoney and SCO Wolff] have indicated that Sgt. Corcoran did not do anything out of the ordinary and that her tone of voice was no more than conversational. Officer DeFilippo on the other hand responded in a nasty and sarcastic tone of voice.

(Id.).

The next incident affecting this lawsuit arose on March 15, 1996 when the Plaintiff filed an Unusual Occurrence Report concerning a damaged locker, chair and desk on the sixth floor of the courthouse. (See Defs.' Ex. L). Plaintiff reported that court reporter Thomas Best informed the Plaintiff that a locker belonging to court reporters, which had previously been reported as removed without permission, had been returned with a broken lock and door. The Plaintiff wrote that a chair and desk at security post 6 had also been damaged. (Id.; Pl.'s Decl. ¶ 36). The Plaintiff summarized the incident in the Unusual Occurrence Report as follows:

It was previously reported that Sgt. E. Corcoran and SCO R. Glock were seen on 3/12/96 at approx. 1800hrs going through the locker and removing objects from it, and also opening draws [sic] in the security desk. Also on that date at approx. 1530hrs Sgt. Corcoran and SCO Glock came to the court reporters office. Sgt Corcoran asked Sylvia Baxt to notarize a document with Sgt. Corcoran' [sic] name and another person. Ms. Baxt informed Sgt Corcoran that she would only notarize Sgt. Corcoran's signature. Sgt. Corcoran became nasty and insisted Ms. Baxt notarize the other signature. Ms. Baxt notarized Sgt. Corcoran' [sic] signature and she left. While this was occurring Mr. Bess[5] noticed that SCO Glock was looking through the security desk and locker. The locker was reported missing the next day 3/13/96 along with a surge protector removed from the copy machine, also at that location. It was also observed that the lock mechanism and door jam plate were removed so the door may not be locked. Interior door between outer door and hallway near elevator #4.

(Id.; see also Pl.'s Decl. ¶¶ 35-38).

---

[5] Although the Plaintiff refers to him as Thomas Bess, it appears the correct name is Thomas Best. (See Defs.' Ex. N).

In response to the Unusual Occurrence Report, Russo requested that Captain Finkelstein investigate the allegations therein. (Russo Decl. ¶ 27). Finkelstein reported back by memorandum dated March 28, 1996. (Defs.' Ex. M). Finkelstein's memo credited the Plaintiff's claims to a certain degree. Finkelstein spoke to Baxt and Best. Baxt explained that Corcoran had not been verbally abusive or nasty to her. Best explained that he had seen SCO Glock going through the locker and desk and that a court reporter who wished to remain unknown had seen Corcoran and Glock taking the locker from the sixth floor ante-room. Both items were returned the next day. (Id.).

Russo again informed Chief Clerk Plumer of the developments concerning the Plaintiff and Corcoran, and the involvement of SCO Glock, by memorandum dated April 8, 1996. (Defs.' Ex. N). Russo requested that the matter be referred to the Inspector General for investigation. (Id.; Russo Decl. ¶ 29).

On April 29, 1996, the Plaintiff filed a claim of discriminatory treatment with the UCS Equal Employment Opportunity Division ("EEO") alleging that he had been treated in a discriminatory way based on his sex and his "not following illegal orders." (Defs.' Ex. O). His complaint was directed at Corcoran for her "continuous entering . . . into the Men's Locker Room and her constant writing of reports against me." (Id.). Attached to the Plaintiff's EEO claim was a letter dated March 12, 1996 (with an indication that the original complaint had been "informally filed" February 29, 1996), in which he complained of his invasion of privacy by Corcoran's presence in the men's locker-room and alleging sexual harassment by Corcoran, and a second "formal complaint" against Corcoran on the same grounds stated in a letter dated April 4, 1996. (Defs.' Exs. P, Q). Plaintiff maintains that Corcoran commenced entering the men's

locker-room in November 1995, and that she ignored his repeated requests that she cease doing so when he was changing into uniform. (Pl.'s Decl. ¶ 40).[6]

Defendant Singer attests that after the Plaintiff filed his claim against Corcoran, the Plaintiff informed Singer that he had listed Singer as a witness to the complained of incidents. (Singer Decl. ¶ 5). Singer told Plaintiff that he had not witnessed any of these events, but was nonetheless contacted on or about June 2, 1996 by an investigator with the EEO Division of UCS. (Id. ¶ 7). Singer told the investigator that he had not witnessed the complained of activity, and then relayed as much to Corcoran in a conversation that Singer alleges the Plaintiff overheard. (Id. ¶¶ 8, 9). Subsequently, according to Singer, the Plaintiff began stalking him around the courthouse, following him to the subway station and making derogatory comments about him. (Id. ¶ 10). Singer also attests that he began to receive telephone calls in the middle of the night and had his tires slashed on three occasions. (Id.). By letter dated June 7, 1996, Singer informed Russo of the Plaintiff's alleged conduct. (Defs.' Ex. R).

The Plaintiff tells a different story with respect to his contact with Singer. The Plaintiff confirms that Singer advised him of his displeasure at being named a witness to the events concerning the Plaintiff and Corcoran. (Pl.'s Decl. ¶ 45). The Plaintiff challenges Singer's allegations of stalking and attests that once Singer was approached about serving as a witness in Plaintiff's discrimination action, "Singer began a campaign to discredit Plaintiff by filing false reports/complaints that Plaintiff was stalking defendant Singer on the Staten Island Ferry." (Id.).

---

[6] Corcoran attests in her declaration that she only entered the men's locker-room upon invitation and that she only entered the "lounge area at the front of the locker room which contained a television, VCR, refrigerator, a couple of couches and a table at which to eat lunch." (Corcoran Decl. ¶ 18). She attests that female SCOs were permitted in this lounge area. (Id.).

Both Singer and the Plaintiff live on Staten Island, both generally worked the same 8 a.m. to 4 p.m. shift, and they regularly traveled on the Staten Island Ferry together. (See Pl.'s Decl. ¶ 46; Pl.'s Ex. D (hearing testimony of Singer)).

Russo informed Chief Clerk Plumer, by memorandum dated June 12, 1996, of the continued incidents concerning the Plaintiff and Singer. (Russo Decl. ¶ 34; Defs.' Ex. T). Russo suggested that the matter be referred to the UCS Office of EEO and requested that he be permitted to reassign the Plaintiff to a command post at a different courthouse, namely 120 Schermerhorn Street, pending resolution of the matter. (Russo Decl. ¶¶ 35-36; Defs.' Ex. T). The Plaintiff was reassigned to the courthouse at 120 Schermerhorn on or about June 17, 1996. (Russo Decl. ¶ 37).

On June 17, 1996,[7] Russo also had a meeting with the Plaintiff in which he asked the Plaintiff to surrender all of his firearms.[8] Russo informed the Plaintiff that UCS records indicated that he owned three firearms. (Id. ¶¶ 38-39). Russo asked the Plaintiff if he owned any other weapons and the Plaintiff said he did not. (Id. ¶ 39). On June 18th and 19th, the Plaintiff surrendered these three firearms. (See id. ¶ 41; Defs.' Exs. U, V).

After the June 17th meeting, Russo initiated an investigation into whether the Plaintiff had purchased a Glock 9-millimeter semi-automatic pistol; he had requested to do so and received all the necessary paperwork authorizing him to do so on May 20, 1996. (Defs.' Ex. X;

---

[7] The Plaintiff attests that both the meeting and his transfer occurred on June 18, 1996 and not June 17, 1996. (Pl.'s Decl. ¶ 54).

[8] Also present at this meeting were the Plaintiff's union delegate, Sergeant Ernest Owens, Lieutenant Berwick, Captain William Jones, Captain Finkelstein, and Major John Morrin. (Russo Decl. ¶ 38).

Russo Decl. ¶ 42).  The investigation revealed that on June 7, 1996, the Plaintiff had purchased such a weapon, which was a fourth firearm in his possession that he had not disclosed in the June 17th meeting.  (Id.  ¶¶ 40, 43; Defs.' Ex. XX).

The Plaintiff explains the chronology of events surrounding the Glock 9mm gun incident differently.  He affirms that he made a request for permission to purchase the gun on May 20, 1996.  (Pl.'s Decl. ¶ 13).  He was notified on or about Friday June 7, 1996 by a Staten Island firearms dealer that the weapon he had been authorized to purchase was available for pick-up; the Plaintiff obtained the gun on the 7th of June.  (Id. ¶ 14).  On Monday June 10, 1996, the next business day from the date he took possession of the weapon, the Plaintiff was out on sick leave.  (Id.  ¶ 15; see also Defs.' Ex. OO).  On June 11, 1996, the Plaintiff reported for work and attests that he submitted a New York State Police Form C, which must be submitted no later than the next regular business day following the purchase of a weapon pursuant to the Court Officers' Rules and Procedure Manual.  (Pl.'s Decl. ¶ 16; Pl.'s Supp. Ex. 6, at 4).  The Plaintiff maintains that, at the instruction of Captain William Jones, he left the form on the desk of Lieutenant William Berwick, who was not on duty that day.  (Pl.'s Decl. ¶ 16).  It was common procedure to leave such forms on Lt.'s Berwick's desk when he was not there to personally receive them.  (Id.; see also Pl.'s Supp. Ex. 3 (hearing testimony of SCO Robert Patelli)).  On June 20, 1996, the Plaintiff was informed that there was no C Form on file at the courthouse for his newly purchased weapon; he submitted a new form dated June 20, 1996.  (Pl.'s Decl. ¶ 18; Pl.'s Supp. Ex. 6, at 7).

Major Russo notified Chief Clerk Plumer, by memo dated June 21, 1996, of the Plaintiff's failure to inform him of the weapon purchase at their June 17th meeting.  (Russo Decl.

¶ 45; Defs.' Ex. Y; Pl.'s Decl. ¶ 55). Because Russo believed that the Plaintiff had deliberately

lied, Russo requested of Plumer that the matter be referred to the Deputy Chief Administrative

Judge for disciplinary action. (Id.). On June 21st, the Plaintiff surrendered the Glock 9-

millimeter pistol. (Defs.' Ex. W). Russo attests that the Plaintiff submitted the New York State

Police Form C for the first time in connection with the Glock 9-millimeter on June 21, 1996.

(Russo Decl. ¶¶ 46 - 47).

On June 25th, 1996, a further incident ensued. Russo was informed by letters from both

Singer and Sergeant Raymond Butler that the Plaintiff approached Singer and Butler as they were

exiting the Whitehall Street subway station and crossing the street to the Staten Island Ferry.

They claimed that the Plaintiff jumped out at them and yelled at them about speaking into a

recorder. (Singer Decl. ¶¶ 12, 13; Defs.' Exs. Z, AA; Russo Decl. ¶ 48).[9] The Plaintiff filed

Unusual Occurrence Report stating that an "employee conflict" had occurred on June 25, 1996 at

the Staten Island Ferry Terminal. (Defs.' Ex. BB). According to the Plaintiff's report, he

encountered Singer and Butler while running to catch the Staten Island Ferry, and the following

occurred:

> As I ran past I heard Sgt. Raymond Butler say, "I heard they are going to get him
> on that." I asked Butler, "Get me on what?', when Singer started yelling, "Don't
> you fucking learn, stay the fuck away from me." I only replied, "speak into the
> mike" and entered the ferry by the lower level."

---

[9] Specifically, Singer wrote that the Plaintiff "jumped out from behind a small building
holding a black object in his hand yelling 'they are going to get who, speak into the tape recorder,
go ahead speak into the tape recorder." (Defs.' Ex. Z). Butler wrote, "I saw SCO DeFillipo who
said to me 'what are they going to get me for?' Sgt. Singer said to him 'stay away from me.' SCO
DeFillipo took out a tape recorder and said to Sgt. Sinfer 'speak into the mike Bob.'" (Defs.' Ex.
AA).

(Id.). The Plaintiff further explained that Singer had previously filed complaints against him which "caused my transfer and he continues to cause me problems." He also stated that he had been receiving prank phone calls and that Singer was the "only one on the job who has my phone number." (Id.). Russo forwarded all of the documentation in connection with the ferry incident to Chief Clerk Plumer, requesting that the Inspector General investigate the matter. (Defs.' Exs. CC, DD; Russo Decl. ¶ 50).

On July 11, 1996, the Plaintiff requested permission to take time off with pay from August 28, 1996 through August 30, 1996. (Defs.' Ex. FF). The request was denied. (Id.).[10] The Plaintiff called in sick from August 21, 1996 through August 30, 1996; he attended a convention in Syracuse, New York on the 28th, 29th and 30th of August. (Russo Decl. ¶ 53).

The Plaintiff explains that he aggravated a pinched nerve injury in his left shoulder while on duty on August 20, 1996. (Pl.'s Decl. ¶ 59). He attests that on August 21, 1996, he requested sick leave for the purpose of going to see his physician about the injury. The physician allegedly told plaintiff he should remain out of work for a minimum period of two weeks; however, the Plaintiff cites no admissible evidence to support this factual assertion. (Id. ¶ 60). With respect to the convention, he attests that was required to attend as a member of the Fraternal Order of Police to vote at the biennial conference. (Id. ¶ 62). He claims he spoke with "a supervising Sergeant" at his command at 120 Schermerhorn Street and was informed that "nothing in the

---

[10] On June 3, 1996, the Plaintiff submitted his summer vacation request form. (See Defs.' Ex. GG). Plaintiff requested vacation on the following dates: 7/1 - 7/5, 7/15 - 7/19, and 8/26 - 8/30. His alternative preferences were 7/22 - 7/26, 8/5 - 8/9, and 8/26 - 8/30. He was granted vacation for 7/15 - 7/19, 7/22 - 7/26, and 8/5 - 8/9. (See id.).

CBA or Court Officer's Manual prevented Plaintiff from leaving his home during 'sick leave.'"

(Id. ¶ 63). No admissible evidence is cited to support these facts.

In a November 11, 1996 letter from the Plaintiff to Martine Arinella, an investigator with UCS's office of Equal Employment Opportunity, the Plaintiff advised EEO that he was withdrawing his complaint against Defendant Corcoran for sexual harassment. (See Defs.' Ex. HH). He wrote that he "wish [sic] that the complaint only read as an exception to Sgt. Corcoran entering the men's locker room aginst guidelines governing such actions" and that he was satisfied that she had been reprimanded for her actions. (Id.).

### C. UCS Disciplinary Process

On April 29, 1997, Defendant Carey, the Deputy Chief Administrative Judge of the New York City Courts, signed a Notice of Charge and Specification of Charge commencing formal disciplinary proceedings against the Plaintiff and seeking his removal from employment as SCO. (See Defs.' Ex. OO; see also Carey Decl. ¶ 17).[11] The disciplinary action was commenced at the

---

[11] In her declaration, Carey explained the process by which disciplinary proceedings are brought against a UCS employee. Counsel's Office for the OCA drafts a Notice and Specification of Charge, describing specific instances of conduct in which the employee has performed incompetently or has engaged in misconduct. (Carey Decl. ¶¶ 6-7). Carey reviews these documents and they are then served on the employee. (Id. ¶ 7). Discipline can be imposed for any act of incompetence or misconduct which has occurred within 18 months of service of the charges. (Id. ¶ 9). A hearing is held before a hearing officer appointed by Carey, at which UCS bears the burden of proving incompetence/misconduct. Evidence is put into the record by UCS through witness testimony under oath and the admission of documentary evidence. (Id. ¶¶ 6, 10). The employee who is the subject of the hearing is present and represented by counsel; the employee may cross-examine any witness called by UCS and may present witness testimony and documentary evidence of his own. (Id. ¶ 12). At the close of evidence, the hearing officer issues a report and recommendation on whether the charges are supported by the evidentiary record; if so, the hearing officer recommends a penalty. (Id. ¶ 13). Carey then reviews the entire hearing transcript, with all exhibits, and the hearing officer's report and recommendation, and in her discretion accepts or rejects the hearing officer's evidentiary findings and/or penalty recommendation. (Id. ¶ 14). Carey is also permitted to consider the employee's entire work

recommendations of several administrative officers, including William Gallagher, Inspector

General of UCS. (See Defs.' Ex. PP) The Specification of Charge served on the Plaintiff

charged the following acts of misconduct and incompetence:

(1)     On or about June 8, 1996, you failed to submit a New York State Police Form C
        to your immediate supervisor, in connection with your purchase of a Glock 9-
        millimeter semi-automatic pistol on June 7, 1996, as required by the Court
        Officers Rules and Procedures.

(2)     On or about June 17, 1996, you disobeyed the order of your supervisor, Major
        Patrick Russo, to immediately surrender all of your firearms, in that you failed to
        turn over a 9mm Glock pistol which you owned.

(3)     On or about June 17, 1996, you lied to your supervisor, Major Russo, when he
        questioned you and told him that you only owned three firearms, when in fact, you
        owned four firearms.

(4)     On or about November 7, 1996, at approximately 2:00 p.m., at an interview at 270
        Broadway, New York, New York, you falsely reported to William Gallagher, the
        Inspector General of the Unified Court System, and Greg Salerno, an investigator,
        that you had not taken possession of a 9mm Glock semi-automatic pistol until
        June 20, 1996, when, in fact, you had purchased and taken possession of the
        weapon on June 7, 1996.

(5)     On or about August 28, August 29, and August 30, 1996, you falsely reported that
        you were absent on sick leave, when in fact, you were attending a convention in
        Syracuse, New York.

(6)     On or about December 11, 1995 at approximately 9:20 a.m., behind the main
        lobby of the Kings County Supreme Court at 360 Adams Street, Brooklyn, New
        York, you screamed at a supervisor, Sergeant Erin Corcoran, "Don't give me
        fucking orders!", in the presence of members of the public, when she directed
        passengers in a manual elevator, which you were operating, to get off the elevator.

(7)     On or about February 29, 1996, at approximately 8:50 a.m., in the main lobby of
        the Kings County Supreme Court at 360 Adams Street, Brooklyn, New York,
        when Sergeant Corcoran inquired why you were off post from your assigned

---

history, including prior disciplinary actions, in determining the appropriate penalty. (Id. ¶ 15).
Ultimately, Carey issues a directive stating whether she accepts the hearing officer's findings,
and describing the penalty to be imposed, if any. (Id. ¶ 16).

position, you angrily screamed "don't ask!", and then walked away and refused to respond to her radio calls to you.

(8)     You have been absent on sick leave an excessive number of days since November 15, 1995, with many sick days next to a holiday or weekend, despite counseling from your supervisors. [Followed by list of twenty-eight specific sick dates].

(Defs.' Ex. OO).

The Plaintiff's hearing before the Honorable Allen Beldock, the appointed Judicial Hearing Officer ("JHO Beldock"), began on September 23, 1997, and continued on October 20, 1997, December 1, 1997 and December 29, 1997. (Defs.' Ex. QQ; Carey Decl. ¶ 21). Numerous persons testified at the hearing, including the Plaintiff himself (who was represented by counsel), defendants Russo and Corcoran, and others who had been involved in the various matters concerning the Plaintiff. (See Carey Decl. ¶ 24). On June 5, 1998, JHO Beldock submitted a twenty-five page Report and Recommendation based on the hearing. (Defs.' Ex. RR). In his report, JHO Beldock summarized the record, the documentary evidence presented and the witness testimony given. He found that the State had sustained its burden of proving incompetency and/or misconduct with respect to certain of the charges brought against the Plaintiff. Specifically, JHO Beldock stated the following:

Based upon all of the evidence before me and which was produced at the hearings as set forth above I find that the State has sustained its burden of proving incompetency and/or misconduct by the respondent with regard to Specifications numbered 1, 2, 3, 4, and 5. I find that the State has not sustained such burden with regard to Specifications numbered 6 and 7. With regard to Specification No. 8, I find that the State has not sustained its burden since it alleges that counselling [sic] had been given to the respondent when in fact it wasn't given until after the last date set forth in that Specification.

(Id. at 25). JHO Beldock recommended that the Plaintiff's disciplinary punishment be a 2 year maximum probationary period, a two hundred dollar fine, and a one month suspension without pay. (Id.).

After receiving JHO Beldock's Report and Recommendation, Carey reviewed it, along with the hearing transcript and all of the exhibits admitted at the hearing. (Carey Decl. ¶ 29). Although Carey was prepared to issue a directive on JHO Beldock's Report and Recommendation by February of 1999, she delayed in doing so as a result of certain developments, including the fact that the Plaintiff had been injured and was requesting placement on three-quarter accidental disability benefits. (Id. ¶ 30). In part because the status of the Plaintiff's return to work was uncertain, Carey did not issue a directive on the disciplinary proceedings until February 28, 2000. On that date, Carey issued Directive No. 7., in which she affirmed JHO Beldock's findings that the evidence substantiated the charges of Specifications 1 through 5. (Defs.' Ex. TT; Carey Decl. ¶ 31). Carey, however, determined that a harsher punishment than the one recommended by JHO Beldock was warranted because of the "serious nature of the charges of misconduct that were substantiated at the hearing." (Defs.' Ex. TT). She imposed a two-year probationary period, a two-hundred dollar fine, a three month suspension without pay, and a denial of overtime opportunities for a period of six months. (Id.).[12] The

---

[12] Pursuant to Directive No. 7, issued on February 28, 2000, the Plaintiff's penalty was to go into effect "immediately." (Defs.' Ex. TT). Because the Plaintiff was on leave from employment with UCS when the penalty was to take effect, on April 4, 2000, Carey issued Directive No. 10, which revoked Directive No. 7. (Carey Decl. ¶ 33; Defs.' Ex. UU). On that same date, Carey issued Directive No. 11, which modified Directive No. 7 only to the extent that the penalties imposed were to take effect "at such time that [the Plaintiff] seeks to return to work as a Senior Court Officer or seeks any other position in the Unified Court System." (Defs.' Ex. VV; Carey Decl. ¶ 34).

Plaintiff never returned to work with UCS. (Carey Decl. ¶ 35). On August 7, 2000, he submitted a letter of resignation indicating that he was resigning from his position as SCO effective August 16, 2000. (See Defs.' Ex. NN).

### D. The Plaintiff's Lawsuit

On April 12, 2000, the Plaintiff filed suit against the defendants; the First Amended Complaint was filed on July 11, 2000. The Plaintiff alleges that the Defendants violated his rights secured by the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983, "to wit: Plaintiff's right to freedom of speech, right to equal protection under the law and due process of law." (Pl.'s Am. Cmpl. ¶ 73). The gravamen of the Plaintiff's complaint is that the Defendants retaliated against him for speaking out about the misconduct of other UCS employees.

The Plaintiff seeks: an order declaring that the Defendants violated Plaintiff's First Amendment rights; a permanent injunction enjoining enforcement of Carey's directives; a permanent injunction enjoining the Defendants and its employees from continuing to violate the First Amendment rights of the Plaintiff and other employees; compensatory and punitive damages; and reasonable costs and attorneys fees. (Id. at 13).

Although it is clear from the factual background provided above that there is a great deal of dispute concerning events connected with the Plaintiff's lawsuit, as will be explained below, these factual disputes – to the extent that they raise triable issues of fact in accordance with the rules governing summary judgment motions – are not material and do not preclude the court's determination that the Defendants' are entitled to judgment as a matter of law in this case.

### II. Summary Judgment Standard

Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and all reasonable inferences and ambiguities must be resolved against the non-moving party. Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001). Where there are no such genuine issues of fact, and all facts, inferences, and ambiguities are construed in favor of the non-moving party, summary judgment for the moving party is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Mack v. Otis Elevator Co., 326 F.3d 116, 119-20 (2d Cir. 2003) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"The Supreme Court has held 'that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 368 (2d Cir. 2003) (emphasis in original) (quoting Liberty Lobby, 477 U.S. at 247-48). That the parties have cross moved for summary judgment does not alter the standard employed. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir.1981)).

### III.    First Amendment Retaliation Claim

It is well established that a public employer cannot discharge or retaliate against an employee for the exercise of his or her First Amendment right of free speech.  Perry v. Sindermann, 408 U.S. 593, 597 (1972).  It is also recognized that the state has an interest as an employer in regulating speech by employees so as to promote the efficiency of public services performed by its employees.  See Connick v. Myers, 461 U.S. 138, 140 (1983) (citing Pickering v. Board of Educ., 391 U.S. 563, 568 (1968)).  To assess the extent to which a state may regulate the speech of its employees, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the government, in the role as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); see also Mandell v. County of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003) (citing Morris v. Landau, 196 F.3d 102, 109-10 (2d Cir. 1999))

Before this balancing test is reached, "[a] public employee claiming First Amendment retaliation must demonstrate that: '(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination.'"  Feingold v. New York, 366 F.3d 138, 160 (2d Cir. 2004) (quoting Mandell, 316 F.3d at 382).  If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action "even in the absence of the protected conduct."  Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  The court determines the status of protected speech as a matter of law.  Connick, 462 U.S. at 148 n. 7.   In the present case, there is

no dispute that the Plaintiff suffered an adverse employment action. The remaining elements of protected speech and causal connection between the speech and the adverse action are discussed below.

### A.     Protected Speech

In order for speech to be protected under the First Amendment, it must relate to a matter of public concern. See Connick, 461 U.S. at 145. The Supreme Court has explained, in the public employee context, that when such an employee speaks

> not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency in reaction to the employees behavior.

Id. at 147; see also Grillo v. N.Y. Transit Auth., 291 F.3d 231, 235 (2d Cir. 2002). Whether certain speech is protected under the First Amendment is determined by analyzing the "content, form and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-8.

The Plaintiff points to two instances of speech for which he claims he was retaliated against in violation of his constitutional rights. The Plaintiff bases his retaliation claim upon his speech alleging sexual discrimination on the part of Sergeant Corcoran by her entrance into the men's locker room, and upon the March 15, 1996 Unusual Occurrence Report he filed asserting that Corcoran and Glock damaged a locker, chair and desk on the Sixth floor of the courthouse at 360 Adams Street. (See Pl.'s Am. Cmpl. ¶¶ 27, 35). The Plaintiff alleges, in his complaint, that the adverse employment actions against him "all resulted from Plaintiff's speaking out against

USC employees' violation of the law and for Plaintiff's utilization of the EEO process, and for no other legitimate non-discriminatory reason." (Id. ¶ 70).

This court finds that this speech was not on a matter of public concern and therefore the Plaintiff has failed to state a claim under the First Amendment. The Plaintiff's objections to Corcoran's continued presence in the men's locker room was speech about a personal matter between the Plaintiff and Corcoran. The Plaintiff's complaints were "personal in nature and generally related to [his] own situation." Ezekwo v. NYC Health and Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991). The case of Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134 (2d Cir. 1993), is instructive. In that case, the plaintiff, Salpaugh, complained to her secretary and a fellow employee of acts of sexual harassment she was subjected to by her supervisor. The Plaintiff alleged that the supervisor retaliated against her and ultimately discharged her as a result of her speaking out against his behavior. See Saulpaugh, 4 F.3d at 138. The Second Circuit held that Saulpaugh had failed to state a claim under the First Amendment because protected speech was not at issue. The Court of Appeals noted that "[h]ad Saulpaugh's complaints to her supervisors implicated system-wide discrimination they would have unquestionably involved a matter of 'public concern.'" Id. at 143.

The present case is analogous to Slaupaugh. The Plaintiff's complaints regarding Corcoran being in the men's locker-room were personal grievances. They did not implicate "system-wide discrimination" on the part of UCS. Rather, the Plaintiff's speech was "motivated by and dealt with [the Plaintiff's] individual employment situation." Id. This is demonstrated by the text of the Plaintiff's own complaints. In his March 12, 1996 complaint, seeking that charges of sexual harassment be brought against Corcoran, the Plaintiff expressed the following:

> I informed Sergeant Corcoran that I did not think it was appropriate for her to be in the locker room when I was trying to get dressed for my tour of duty. . . . Sgt. Corcoran repeatedly entered my locker room in the morning and at lunch. . . . I am asking for this action because I am not comfortable with her around and feel that there may be attempts at retribution, made by Sgt. Corcoran, against me.

(Defs.' Ex. P).  In his subsequent written complaint, the Plaintiff began, "This is a second formal complaint against Sgt. Erin Corcoran for violation of my right to privacy in my locker room." (Defs.'' Ex. Q).  This supports the finding that this speech did not implicate a matter of public concern.  Indeed, the Plaintiff ultimately withdrew the sexual harassment claim he filed with the EEO, and stated that he wished his complaint of Corcoran's behavior to serve only "as an exception to Sgt. Corcoran entering the men's locker."  (See Defs.' Ex. HH).  It is clear to the court that the Plaintiff's primary aim "was to improve his treatment as a [UCS] employee and not to speak out as a citizen about systemic [sexual] discrimination at [UCS]."  Alexander v. Karosi, No. 95-CV-2469, 1996 WL 684387, at *5 (D. Conn. Aug. 12, 1996).  The Plaintiff's speech regarding Corcoran's alleged sexual harassment therefore is not protected under the First Amendment.  See Settecase v. Port Authority of N.Y. & N.J., 13 F. Supp. 2d 530, 536 (S.D.N.Y. 1998) (holding that employee's complaints of unfair work practices and sexual discrimination were personal in nature and not a matter of public concern).

The Plaintiff's March 15, 1996 Unusual Occurrence Report detailing his allegations against Sergeant Corcoran and SCO Glock regarding the damaged locker, chair and desk similarly is not speech on a matter of public concern.  Again, this speech was directed at Corcoran and Glock alone, and did not address or assert a problem of system-wide theft within the Unified Court System.  See Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 420 (7th Cir. 1988) ("The lawsuit does not seek relief against pervasive or systemic misconduct by a public

agency or public officials, and, . . . is not part of an overall effort by the plaintiff . . . to correct

allegedly unlawful practices or bring them to public attention.").  Moreover, the Unusual

Occurrence Report, by the Plaintiff's own admission, was filed in the ordinary course of

Plaintiff's duties as an SCO.   (See Pl.'s Aff. ¶ 5 ("Plaintiff . . . complied with his duties as a law

enforcement officer when he reported a violation of the law (the aforementioned theft by

Corcoran).)).  As Judge Koeltl of the Southern District of New York has explained:

> A communication by an employee to an employer in the course of the employe''s
> normal duties, in routine form, and containing standard contents is not likely to
> address a matter of public concern.  However, the fact that an employee is
> speaking in the employee's capacity as an employee in furtherance of official
> duties does not preclude a finding that the employee is speaking on a matter of
> public concern . . . . The fundamental question is whether the employee is seeking
> to vindicate personal interests or to bring to light a matter of political, social, or
> other concern to the community.

Rao v. N.Y.C. Health and Hosps Corp., 905 F. Supp. 1236, 1242-43 (S.D.N.Y. 1995) (internal

citations and quotation marks omitted) (holding that speech at issue was on a matter of public

concern because the plaintiff's "primary intent in [offering the speech] was not to further his own

professional development, but to make his superiors aware of problems in the management of a

major city project and of perceived extortion attempts.").

In the present case, the record establishes that the Plaintiff's speech concerning

Corcoran's and Glock's alleged involvement in damaging court property was not meant to "bring

to light a matter of political, social, or other concern to the community."  Rather, it was likely an

attempt by the Plaintiff to gain an advantage in his antagonistic relationship with Sergeant

Corcoran.  In any event, it was not meant to alert the public to a systemic problem within UCS of

theft.  See Cahill v. O'Donnell, 75 F. Supp. 2d 264, 273 (S.D.N.Y. 1999) ("In this case, the

plaintiffs were not attempting to bring to the public's attention [a] pervasive and systematic cover-up in Internal Affairs. Rather they simply exercised their duties, as Internal Affairs personnel, to investigate allegedly improper occurrences within the State Police, and to report their findings as requested.").

The Plaintiff argues that he was commenting on a widespread theft and corruption scandal within UCS, and therefore that his speech regarding Corcoran and Glock was on a matter of public concern. (See Pl.'s Resp. at 3-6). In his responsive Memorandum of Law, the Plaintiff argues that there was systemic theft and corruption at 360 Adams Street at this time and mentions several investigations into the conduct of certain judges. (Id.). This argument, however, is not material to the instant motions for summary judgment. The Plaintiff is obligated to raise a triable issue of fact by offering admissible evidence to support a factual dispute. There is nothing in the record beyond the Plantiff's conclusory allegations to support the Plaintiff's contentions of widespread theft and corruption within UCS, or the fact that his speech was meant to address such a concern.[13]  Moreover, the case of Rookard v. Health and Hosps. Corp., 710 F.2d 41 (2d Cir. 1983), on which the Plaintiff relies, is unavailing. In Rookard, the Second Circuit determined that an allegation of "corrupt and wasteful practices at a large municipal hospital" made by the corporation's Director of Nursing to the Inspector General of the hospital "obviously involves a matter of public concern." Rookard, 710 F.2d at 46. There, the plaintiff went to a city

---

[13] I note as well that the Plaintiff, in his responsive Memorandum of Law, and other Memoranda of Law filed in connection with the pending cross-motions, raises allegations that Russo was employed in a second job by Chief Clerk Plumer and that Russo was allegedly improperly spending time at this second job while he was supposed to be on duty as a UCS employee. (See, e.g., Pl.'s Resp. at 5). Again, the Plaintiff has offered no evidentiary support for these proffered facts and they therefore will not be considered on his motion for summary judgment.

official with charges of a scheme within the hospital's administration to authorize unlawful permits allowing unlicensed nurses to work, as well as a host of other irregularities in the nursing staff policy. Id. at 43-44. This speech was held to be on a matter of public concern. The actions of the Plaintiff in the instant action, however, are distinguishable. Here, the Plaintiff filed a single report focused only on the alleged involvement of Corcoran and SCO Glock in damaging a locker, desk and chair belonging to court reporters. The Plaintiff does not allege that Corcoran and Glock were involved in more that this one episode, nor does he allege that this incident was made in the context of a widespread theft of property problem.[14] In contrast to the facts in Rookard, I cannot find this Unusual Occurrence Report to be speech on a matter of public concern.

The case of Cahill v. O'Donnell, 75 F. Supp. 2d 264 (S.D.N.Y. 1999), also provides support for the finding that the Unusual Occurrence Report filed by Plaintiff is not First Amendment protected speech. In Cahill, the plaintiffs, members of the internal affairs unit of the New York State Police, alleged First Amendment retaliation based primarily on speech concerning investigations they undertook in the course of their employment. The speech was held not to be constitutionally protected because their "investigations and the statements made incident to them that [were] the subject of [the] lawsuit occurred in the ordinary course of plaintiffs' work as members of Internal Affairs." Cahill, 75 F. Supp. 2d at 273. The court explained:

---

[14] Indeed, in the section of the Unusual Occurrence Report where the person filing the report is asked to identify the nature of the unusual occurrence, the Plaintiff did not check "report of crime," "property theft", or "property damage," but rather checked "other" and failed to specify what he meant by that notation. (See Defs.'' Ex. L.).

The plaintiffs' work in the Internal Affairs department is undoubtedly important, and the vigilance and integrity of police officers is, in a general way, a matter of public concern. Plaintiffs' actions, under the circumstances presented here, were encompassed within their day-to-day professional obligations within their department and are not fairly distinguishable from the responsibilities of all personnel within Internal Affairs. In this case, the plaintiffs were not attempting to bring to the public's attention pervasive and systematic cover-up in Internal Affairs. Rather they simply exercised their duties, as Internal Affairs personnel, to investigate allegedly improper occurrences within the State Police, and to report their findings as requested. The speech documented in this lawsuit was not public, but was intramural.

Id. Like in Cahill, here the Plaintiff has raised what may be legitimate concerns about the conduct of certain UCS employees; there is certainly dispute as to the facts surrounding the damaged locker and desk. However, despite the fact that the Plaintiff may have been reporting improper conduct and notwithstanding the fact that it is important that all public employees perform their job duties appropriately, the Plaintiff's speech encompassed in the Unusual Occurrence Report is simply not speech on a matter of public concern. The admissible evidence presented on these cross-motions for summary judgment establishes that the Plaintiff was not speaking out in an attempt publicly to expose institutional problems. Although "arguably the plaintiff['s] comments were motivated by apparent concerns over [employee] wrongdoing, the substance, tenor and purpose of the speech . . . was not public speech in any realistic sense but was motivated by private interests or pertained to routine business and normal police duties." Id.

The Supreme Court has explained that "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark . . . would plant the seed of a constitutional case." Connick, 461 U.S. at 149. Upon close review of the record, considering the form, content and context of the Plaintiff's speech, I find as a matter

of law that the speech at issue is not on a matter of public concern, and therefore is not protected

by the First Amendment. The Plaintiff's First Amendment retaliation claim therefore fails.

### B. Causal Connection Between Protected Speech and Retaliatory Action

To make out a prima facie case of First Amendment retaliation, the Plaintiff must also

show a causal connection between the protected speech and the adverse employment action he

suffered, here the formal disciplinary charges brought against him. "The causal connection must

be sufficient to warrant the inference 'that the speech played a substantial part in the employer's

adverse employment action.'" Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000)

(quoting Ezekwo, 940 F.2d at 780-81). Typically, once a plaintiff meets his burden of showing

that his conduct was constitutionally protected and that the conduct was a substantial or

motivating factor in the adverse action, the defendant is given an opportunity to show by a

preponderance of the evidence that it "would have reached the same decision . . . even in the

absence of the protected conduct." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S.

274, 287 (1977). Summary judgment is inappropriate where questions regarding an employer's

motive "predominate in the inquiry regarding how important a role the protected speech played

in the adverse employment decision." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).

Moreover, the Plaintiff cannot rely on conclusory allegations of retaliatory motive, but must

present "some tangible proof to demonstrate that [his] version of what occurred was not

imaginary." Id. at 111.

In his Amended Complaint, the Plaintiff alleges as follows: "All of the incidents referred

to within the [Disciplinary] Charge against Plaintiff were based on false and misleading

information from Major Russo and Sgt. Corcoran, in retaliation for Plaintiff's speaking out

against other UCS employees' violations of law." (Am. Compl. § 63). From reviewing the record in this case, the court would conclude that the Plaintiff has failed to raise a triable issue of fact on this element. In other words, it seems plain that even if the Plaintiff could adequately show that his speech was a factor in UCS's decision to seek disciplinary action against him, the Defendants would prevail because there is no material issue of fact in dispute concerning the fact that the decision would have been made even in the absence of the speech. Mt. Healthy, 429 U.S. at 287. There is ample evidence in the record, which the Plaintiff has failed to controvert, which supports UCS's decision to pursue disciplinary action against the Plaintiff notwithstanding his specific complaints about Corcoran and the March 15, 1995 Unusual Occurrence Report.

However, the court need not reach the merits of this issue and declines to do so. Because I have held that the speech for which Plaintiff claims he was retaliated against is not protected by the First Amendment, the element of causation need not be decided.[15] Based on the lack of protected speech, the Defendants' motion for summary judgment on the First Amendment retaliation claim is granted and the Plaintiff's motion for summary judgment on the same is denied.

## IV.    Due Process Claim

The Plaintiff also alleges in his motion for summary judgment and in response to the Defendants' motion that the Defendants violated his due process rights in connection with his disciplinary hearing. The Defendants argue that the Plaintiff should be barred from raising a due

---

[15] For the same reasons, I also will not conduct a balancing of the interests of the employee, as a citizen, "in commenting upon matters of public concern" and the interest of the State, as an employer, "in promoting the efficiency of the public service it performs through its employees." Pickering, 391 U.S. at 568.

process claim because it was not alleged as a cause of action in the Plaintiff's First Amended

Complaint. (See Defs.' Mot., at 20 n.2). The court agrees that the Plaintiff's First Amended

Complaint appears by all accounts to allege only the First Amendment retaliation claim. This

was most unequivocally established by the Plaintiff's description of his first *and only* cause of

action: "AS AND FOR A FIRST CAUSE OF ACTION (42 U.S.C. § 1983 – First Amendment)."

(Am. Cmpl., at 12). Moreover, throughout the complaint, the Plaintiff clearly alleges retaliation

by the Defendants based on his speech on a matter of public concern, (see id. ¶¶ 1, 45, 46, 48, 63,

70, 7, 73, 74), and, importantly, the facts alleged in the complaint relate only to the First

Amendment, and not a due process claim.[16] Nothing in the allegations presented in the

Plaintiff's Amended Complaint suggest that he asserts a violation of his rights in connection with

the disciplinary hearing. The Plaintiff alleges only that the charges were brought against him "in

retaliation for Plaintiff's speaking out against other UCS employees' violations of the law."

---

[16] In his Reply Memorandum of Law, the Plaintiff clarifies the grounds underlying his due process claim as follows:

> The basis for Plaintiff's Due Process claim is that defendants failed to provide Plaintiff with an adequate Report and Recommendation [of the Judicial Hearing Officer following his Disciplinary Hearing], based on evidence in the record, uninfluenced by extralegal considerations, findings of fact in some form being essential so as to permit an intelligent challenge by an aggrieved party and adequate judicial review following the determination. . . . Both the failure to provide Plaintiff with the Report and Recommendation, prior to the Directives being issues, and the Directives failing to set forth new facts based upon evidence in the record, uninfluenced by extralegal considerations are violations of Plaintiff's right to Due Process of law.

(Pl.'s Reply at 2). In the facts alleged in the Amended Complaint, the Plaintiff does not allege that he was never provided the JHO's Report and Recommendation, nor does he allege that extralegal considerations went into the determinations following his disciplinary proceedings. Moreover, the Plaintiff does not in any admissible form even contest the underlying basis of his termination, viz. that he falsely stated to his superiors that he did not have additional registered handguns when in fact he did.

(Am. Cmpl. ¶ 63). In the facts alleged, he simply recounts the dates of the hearing, the

approximate date when the Report and Recommendation was issued, the fact that he was found

guilty of certain specifications, and the difference between the punishment recommended by the

R&R and the penalty ultimately imposed by Carey. (See id. ¶¶ 64-69). These facts do not raise a

viable due process claim, notwithstanding the passing reference to the Fourteenth Amendment in

the Plaintiff's complaint.[17]

The pleading requirements of the Federal Rules of Civil Procedure are designed to

provide defendants fair notice of what the plaintiff's claim is and the grounds upon which it rests.

"Although a complaint need not correctly plead every legal theory supporting the claim, at the

very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare

an appropriate defense." Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y.

2000) (internal citations omitted); see also Arnold v. Storz, No. 00-CV-4485, 2005 WL 2436207,

at * 5 (E.D.N.Y. Sept. 30, 2005). The assertion of a claim this late in the game prejudices the

defendants. Thus, courts consistently hold that it is inappropriate to raise new claims for the first

time in submissions opposing summary judgment. See id.; Rochetti v. N.Y. State Dept. of Motor

Vehicles, No. 02.CV.1710, 2005 WL 2340719, at *7 (E.D.N.Y. June 13, 2005).

While the court notes that the Plaintiff did mention the 14th Amendment in his complaint

and did reference "the due process of law", (see Am. Compl. ¶ 73), it is plain that the Amended

Complaint does not allege a due process violation in connection with the Plaintiff's disciplinary

---

[17] The court notes also that it is fair to infer that the reference to the Fourteenth
Amendment in the Plaintiff's Amended Complaint is meant to address the fact that the First
Amendment is applied to states by incorporation through the due process clause of the
Fourteenth Amendment.

hearing.  I also note that I am cognizant that the Plaintiff is technically a pro se litigant.

However, the Plaintiff's pro se status does not save him from facing the consequences of this

deficiency.  As mentioned supra, the Plaintiff is a licensed and practicing attorney and therefore

is not entitled to the "special considerations normally afforded to pro se litigants."  Levine v.

McCabe, 357 F. Supp. 2d 608, 613-14 (E.D.N.Y. 2005) (citing Harbulak v. Suffolk Cty., 654

F.2d 194, 198 (2d Cir. 1981)).  In addition, from the face of the First Amended Complaint, it is

clear that the Plaintiff was represented by counsel at the time the complaint was filed.  (See

Defs.' Ex. WW).

Although in some circumstance I might grant a plaintiff leave to file an amended

complaint in light of the fact that he or she has not sufficiently pled a claim, I am not going to do

so in the instant matter.  The Plaintiff has already amended the complaint once, and this litigation

has been ongoing since 2000.  Moreover, "leave to amend a complaint will generally be denied

when the motion to amend is filed solely in an attempt to prevent the Court from granting a

motion . . . for summary judgment, particularly when the new claim could have been raised

earlier." Beckman, 79 F. Supp. 2d at 408 (citing Berman v. Parco, 986 F. Supp. 195, 217

(S.D.N.Y. 1997)).

Here, the Plaintiff has alleged only a First Amendment retaliation claim, and that claim is

properly dismissed on the Defendants' motion for summary judgment.  As the Plaintiff failed to

allege a due process violation, I will not consider the merits of that claim on the present cross-

motions for summary judgment.

**V.      Other Arguments**

As the court has found that the Plaintiff's First Amendment retaliation claim is without

merit as a matter of law, and that the Plaintiff is barred from raising a due process claim at this

time, the remaining arguments put forth by the parties, including qualified immunity, Eleventh

Amendment immunity, and various res judicata claims, need not be addressed.

**VI.      CONCLUSION**

For the reasons discussed above, the Plaintiff's motion for summary judgment is denied.

The Defendants' motion for summary judgment is granted in its entirety.  The Plaintiff's claim is

dismissed with prejudice.


SO ORDERED.

Dated:  March 27, 2006                              /s/ Nicholas G. Garaufis
              Brooklyn, New York                    NICHOLAS G. GARAUFIS
                                                    United States District Judge